UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LARRY CURTI, Derivatively on Behalf of CHARTER COMMUNICATIONS, INC.,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>CHRISTOPHER L. WINFREY, JESSICA M. FISCHER, ERIC L. ZINTERHOFER, W. LANCE CONN, JOHN D. MARKLEY, JR., BALAN NAIR, STEVEN A. MIRON, MICHAEL A. NEWHOUSE, MAURICIO RAMOS, KIM C. GOODMAN, CAROLYN J. SLASKI, GREGORY B. MAFFEI, JAMES E. MEYER, and DAVID MERRITT,<br><br>　　　　　　Defendants,<br><br>　　-and-<br><br>CHARTER COMMUNICATIONS, INC., a Delaware Corporation,<br><br>　　　　　　Nominal Defendant. | No.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECURITIES LAW, FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Charter Communications, Inc. ("Charter" or the "Company") against certain of its officers and directors for violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of law.  These wrongs resulted in significant damages to Charter's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.     This action concerns the Company's reliance on a government subsidy—the Affordable Connectivity Program ("ACP").  The ACP was a $14 billion plan, passed by Congress in November 2021, to provide high-speed internet service to low-income rural customers at no cost to the customer.  Under the ACP, the Federal Communications Commission ("FCC") would directly reimburse broadband providers for offering discounted internet plans to eligible low-income subscribers.

3.     This was great for Charter, but only in the short term.  By 2023, the Company was the single largest ACP participant in the United States.  Unfortunately, when Congress appropriated funds for the ACP, it structured the program to sunset in 2024.  In early 2024, the FCC announced that, because additional funding had not been secured, no new ACP subscribers would be enrolled after February 7, 2024, and all ACP subsidies would terminate in May 2024.  This posed a significant problem for Charter.  Instead of telling the truth—that the Company was over-reliant on ACP and Charter would experience adverse material impacts from its cancellation for at least another year—the Individual Defendants (as defined herein) assured investors that the impact of the ACP's expiration was temporary, manageable, and would be fully behind the

Company by the end of 2024. Additionally, the Individual Defendants offered short-term discounts that would expire and caused churn which created a short-term solution at the expense of the Company's long-term growth.

4.      Before the truth emerged, the Company repurchased its own stock at artificially inflated prices. Between August 2024 and July 2025, Charter repurchased approximately 8.6 million shares of its common stock, spending more than $3.2 billion. Following the disclosures regarding the end of ACP's true impact on the Company, Charter's stock price fell to $261.75 per share—revealing that the repurchased shares were in fact worth approximately $2.2 billion. As a result, Charter overpaid by roughly $948.9 million, causing significant harm to the Company.

5.      In truth, the Individual Defendants' repeated assurances regarding the end of the ACP and its impact on Charter were materially false and misleading. On July 25, 2025, the Company disclosed that the end of the ACP had materially impacted Charter in two key ways: (i) the Company had continued to lose significant numbers of former ACP subscribers who could no longer afford Charter's services without the ACP subsidy; and (ii) Charter would continue to lose recently-acquired customers who would have qualified for the ACP, as its "non-pay[s]" (customers at risk of termination) had also dramatically risen. Accordingly, the "headwind" from the ACP's end would continue to impact the Company into the foreseeable future, and Charter remained at high risk of losing even more of its millions of former ACP internet subscribers.

6.      In the wake of the July 25, 2025, disclosure, Charter's stock plunged more than 31% or $118.25 per share for seven days until August 4, 2025, to close at $261.75 per share compared to July 24, 2025's closing of $380 per share, erasing almost $16.2 billion in market capitalization.

7.      Further, as a direct result of this unlawful course of conduct, Charter is now the subject of a federal securities class action lawsuit filed in the United States District Court for the

Southern District of New York on behalf of investors who purchased Charter's shares (the "Securities Class Action").

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because plaintiff's claims raise a federal question under sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1) and SEC Rule 10b-5 (17 C.F.R §240.10b-5) promulgated thereunder.  This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

9.      This action is not a collusive one to confer jurisdiction on a court of the United States that which it would not otherwise have.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because a substantial part of the events, omissions, wrongs, transactions, and acts complained of and giving rise to the claims asserted herein, including defendants' involvement in the same as detailed herein, occurred in this District.  Additionally, the Securities Class Action is ongoing in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff Larry Curti was a stockholder of Charter at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Charter stockholder.  Plaintiff is a citizen of California.

**Nominal Defendant**

13.     Nominal Defendant Charter is a Delaware corporation with principal executive offices located at 400 Washington Blvd., Stamford, Connecticut.  Charter was founded in 1993 and is a broadband connectivity company with services available to fifty-eight million homes and small to large businesses across forty-one states through their Spectrum brand.  The Company offers seamless connectivity and entertainment with Spectrum Internet, Mobile, TV, and Voice products.  As of December 31, 2025, Charter had approximately 91,900 active full-time equivalent employees.

**Defendants**

14.     Defendant Christopher L. Winfrey ("Winfrey") has been Charter's President and Chief Executive Officer ("CEO") since December 2022, and a director since November 2023.  He was also Charter's Chief Operating Officer from October 2021 to December 2022; and Executive Vice President and Chief Financial Officer from November 2010 to October 2021.  Defendant Winfrey is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Charter paid defendant Winfrey the following compensation as an executive:

| Year | Salary | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|
| 2025 | $1,823,846 | $4,263,146 | $379,201 | $6,466,193 |

| Year | Salary | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $1,700,000 | $3,756,150 | $296,510 | $5,752,660 |

15.     Defendant Jessica M. Fischer ("Fischer") has been Charter's Chief Financial Officer ("CFO") since October 2021.  She was also Charter's Executive Vice President, Finance from January 2021 to October 2021; Senior Vice President, Finance and Corporate Treasurer from May 2018 to January 2021; and Deputy Treasurer from May 2017 to May 2018.  Defendant Fischer is named as a defendant in the Securities Class Action that alleges she violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Charter paid defendant Fischer the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2025 | $942,308 | $199,858 | $1,800,051 | $1,488,616 | $25,424 | $4,456,257 |
| 2024 | $800,000 | - | - | $1,060,560 | $25,659 | $1,886,219 |

16.     Defendant Eric L. Zinterhofer ("Zinterhofer") has been Charter's Non-Executive Chairman of the Board since November 2023, and a director since November 2009.  He was also Charter's Chairman from November 2009 to May 2016.  Charter paid defendant Zinterhofer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $65,000 | $494,763 | $559,763 |
| 2024 | $65,000 | $469,690 | $534,690 |

17.     Defendant W. Lance Conn ("Conn") has been a Charter director since September 2004.  Charter paid defendant Conn the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $232,000 | $224,713 | $456,713 |
| 2024 | $238,333 | $199,799 | $438,132 |

18. Defendant John D. Markley, Jr. ("Markley") has been a Charter director since November 2009. He has been a member of the Audit Committee since at least March 2024. Charter paid defendant Markley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $263,000 | $224,713 | $487,713 |
| 2024 | $269,667 | $199,799 | $469,466 |

19. Defendant Balan Nair ("Nair") has been a Charter director since May 2013. Charter paid defendant Nair the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2025 | $344,626 | $344,626 |
| 2024 | $319,572 | $319,572 |

20. Defendant Steven A. Miron ("Miron") has been a Charter director since May 2016. Charter paid defendant Miron the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $25,000 | $344,626 | $369,626 |
| 2024 | $25,000 | $319,752 | $344,752 |

21. Defendant Michael A. Newhouse ("Newhouse") has been a Charter director since May 2016. Charter paid defendant Newhouse the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $160,000 | $224,713 | $384,713 |
| 2024 | $160,000 | $199,799 | $359,799 |

22. Defendant Mauricio Ramos ("Ramos") has been a Charter director since May 2016. Charter paid defendant Ramos the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $45,000 | $344,626 | $389,626 |
| 2024 | $38,770 | $319,572 | $358,342 |

23.     Defendant Kim C. Goodman ("Goodman") has been a Charter director since July 2016. She has been a member of the Audit Committee since at least March 2024. Charter paid defendant Goodman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2025 | $66,000 | $344,626 | $410,626 |
| 2024 | $64,333 | $319,572 | $383,905 |

24.     Defendant Carolyn J. Slaski ("Slaski") has been a Charter director since April 2024. She has been Chairman of the Audit Committee since at least February 2026 and a member of that committee since at least March 2025. Charter paid defendant Slaski the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2025 | $224,589 | $224,713 | $449,302 |
| 2024 | $151,612 | $199,799 | $351,411 |

25.     Defendant Gregory B. Maffei ("Maffei") was a Charter director from May 2013 to April 2025. Charter paid defendant Maffei the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2025 | $13,962 | - | $13,962 |
| 2024 | $45,000 | $319,572 | $364,572 |

26.     Defendant James E. Meyer ("Meyer") was a Charter director from July 2018 to April 2025. Charter paid defendant Meyer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2025 | $43,438 | - | $43,438 |
| 2024 | $140,000 | $199,799 | $339,799 |

27. Defendant David Merritt ("Merritt") was a Charter director from July 2003 to January 2026. He was Chairman and a member of the Audit Committee since at least March 2024 to January 2026. Charter paid defendant Merritt the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $207,514 | $224,713 | $432,227 |
| 2024 | $248,060 | $199,799 | $447,859 |

28. The defendants identified in ¶¶14-15 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶16-27 are referred to herein as the "Director Defendants." The defendants identified in ¶¶18, 23, 24, 27 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶14-27 are referred to herein as the "Individual Defendants."

**Non-defendants**

29. Non-defendant Martin E. Patterson ("Patterson") has been a Charter director since April 22, 2025. The Company paid Patterson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $110,685 | $224,713 | $335,398 |

30. Non-defendant J. David Wargo ("Wargo ") has been a Charter director since April 22, 2025. The Company paid Wargo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $100,308 | $224,713 | $325,021 |

31. Non-defendant Wade Davis ("Davis") has been a Charter director since January 2026.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

32. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Charter and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Charter in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Charter and not in furtherance of their personal interest or benefit.

33. To discharge their duties, the officers and directors of Charter were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Charter were required to, among other things:

(a) only make truthful statements concerning how the end of the ACP would affect the Company;

(b) disclose the true nature of Charter's broadband business;

(c) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d) remain informed as to how Charter conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

34.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Charter, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

35.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to: (i) repurchase Charter stock at artificially inflated prices; and (ii) make materially false and misleading statements, improper practices that wasted the Company's assets, and caused Charter to incur substantial damage.

36.     The Individual Defendants, because of their positions of control and authority as officers and directors of Charter, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Charter has expended, and will continue to expend, significant sums of money.

37.     Charter's Corporate Governance Guidelines states that "[d]irectors shall have full and unrestricted access to the Company's management and employees in order to be informed about the Company's business and for such other purposes as may be useful to the Board in fulfilling its responsibilities."  The Corporate Governance Guidelines further state that the Code of Conduct applies to "all employees" and directors.

38.     Charter's Code of Conduct emphasizes that Charter holds its employees and directors to the "highest standard of integrity and ethical behavior."  In particular, the Code of

Conduct states:

**WE FOLLOW ETHICAL BUSINESS PRACTICES**

As we execute for success and deliver results, Charter strives to be a good corporate citizen through ethical business practices complying with applicable laws. To support this goal, we are expected to:

• *Record and report business and financial information and results completely, accurately, and timely—both internally and externally, including in filings with the Securities and Exchange Commission*

• Act in good faith in our dealings with Charter's business partners

• *Act in the best interest of Charter in carrying out our day-to-day responsibilities and business dealings*

• *Incorporate Charter's Employee Handbook and internal policies and procedures, as well as all laws, rules, and regulations applicable to Charter* into our planning and execution.

39.    The Individual Defendants failed to adhere to the Company's Code of Conduct and Corporate Governance Guidelines.  As discussed in more detail below, the Individual Defendants continuously issued or personally made materially false and misleading statements concerning the Company's reliance on ACP.

**Additional Duties of the Audit Committee Defendants**

40.    In addition to these duties, under its Charter in effect since October 24, 2023, the Audit Committee Defendants, defendants Markley, Goodman, Slaski, and Merritt, owed specific duties to Charter to assist the Company's Board of Directors (the "Board") in overseeing: (i) the integrity of the financial reports and other financial information provided by the Company to its stockholders and others; (ii) the Company's financial policies and procedures and disclosure controls and procedures; (iii) the Company's system of internal control over financial reporting; (iv) the Company's auditing, accounting, and financial reporting processes; and (v) the Company's financial and operational risk management.  Regarding risk, the Audit Committee's Charter states

that the Audit Committee shall:

> ***Discuss with management the Company's and its subsidiaries' material financial risk exposures*** … and the steps management have taken to detect, monitor and control such exposures, including the Company's risk assessment and risk management policies.

*   *   *

> With respect to the Company's internal auditing and controls, on an annual basis, review (a) the quality and composition of the Company's internal audit staff and the reporting relationship amongst the internal auditor, financial management and the Audit Committee; (b) ***the risk assessment process, scopes and procedures to determine whether they are adequate to attain the internal audit objectives, as determined by managemen***t; (c) the internal audit plan developed by the Company and explanations of deviations therefrom and proposed changes thereto; (d) significant fraud or regulatory noncompliance; (e) any difficulties encountered by internal audit in the course of their audits; and (f) anything else the Committee deemed appropriate.

41.     The Audit Committee Charter further requires the Audit Committee to "[r]eview the Company's compliance systems with respect to legal and regulatory requirements that affect financial reporting, including reviewing the Company's codes of conduct and compliance programs."  Additionally, the Audit Committee is responsible for reviewing annual and quarterly financial statements:

> *Periodic Reports and the Disclosure Process*. Meet to review and discuss with management, internal audit and the registered public accounting firm: (a) ***the annual audited and quarterly financial statements of the Company and its reporting subsidiaries;*** (b) ***specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations***;" (c) the matters required to be discussed pursuant to Statement on Auditing Standards No. 114; (d) ***significant deficiencies and material weaknesses in the design or operation of internal controls and procedures for financial reporting, any changes made or proposed to such controls and procedures, and any fraud by any person involved therewith***; (e) any reports of the registered public accounting firm and disclosures concerning internal controls and procedures for financial reporting and disclosure controls and procedures; and (f) anything else the Committee deemed appropriate. ***The Audit Committee shall recommend to the Board of Directors whether the financial statements should be included in the Company's Form 10-K***.
>
> *Review of Accounting Matters*. Review and discuss with management and the registered public accounting firm, as applicable: (a) the scope of any audit, the

results of the annual audit examination by the registered public accounting firm, and any problems or difficulties the auditor encountered in the course of its audit work and management's response; (b) any reports of the registered public accounting firm with respect to interim periods; (c) major issues regarding accounting principles, alternative accounting treatments, accounting estimates and financial statement presentations and disclosures; (d) *major issues as to the adequacy of the Company's internal controls and special audit steps adopted in light of material control deficiencies*; (e) material written communications between the registered public accounting firm and management; (f) accounting treatment for unusual transactions; (g) the effect of regulatory and accounting initiatives on the financial statements of the Company; (h) *earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies*; and (i) anything else the Committee deemed appropriate.

\*        \*        \*

*Internal Audit Review*. With respect to the Company's internal auditing and controls, on an annual basis, review (a) the quality and composition of the Company's internal audit staff and the reporting relationship amongst the internal auditor, financial management and the Audit Committee; (b) the risk assessment process, scopes and procedures to determine whether they are adequate to attain the internal audit objectives, as determined by management; (c) the internal audit plan developed by the Company and explanations of deviations therefrom and proposed changes thereto; (d) significant fraud or regulatory noncompliance; (e) any difficulties encountered by internal audit in the course of their audits; and (f) anything else the Committee deemed appropriate.

\*        \*        \*

*Review of Registered Public Accounting Firm*. Obtain and review, at least annually, a report by the registered public accounting firm describing (a) the registered public accounting firm's internal quality control procedures and (b) *any material issues raised by the most recent internal quality control review, or peer review, or by any inquiry* or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the registered public accounting firm, and any steps taken to deal with such issues.

42.    While the Audit Committee Defendants had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communication with the public, the Audit Committee Defendants failed to fulfill these responsibilities.  In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and omissions of

material fact described herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

44.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Charter, regarding the Individual Defendants' management of Charter's operations, specifically regarding the ACP; and (ii) enhance the Individual Defendants' executive and directorial positions at Charter and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

45.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's reliance on ACP.

46.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly make materially false and misleading statements concerning Charter's operations.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct,

necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

47.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## CHARTER'S OPERATIONS ARE DEPENDENT ON RESIDENTIAL SERVICES

48.     Charter is a broadband connectivity company that offers high-speed internet, video, mobile, and voice services to residential and commercial customers throughout the United States under the Spectrum brand.  Charter serves approximately fifty-eight million homes and businesses across forty-one states.  Historically, the Company has generated most of its revenue from residential customers.  In 2024, Charter reported total revenue of approximately $55.1 billion, of which roughly $43 billion was derived from residential services, followed by approximately $7.3 billion from commercial services and approximately $1.8 billion from advertising sales.

49.     Charter's most important and durable revenue driver is its residential internet service.  In 2024, residential internet services accounted for approximately 55% of Charter's total residential revenue and approximately 42% of total Company revenue.  More than 95% of Charter's residential customer relationships include internet service, making broadband the foundational product upon which Charter markets and bundles its mobile, video, and voice offerings.  Because of this structure, growth in internet subscribers has always been fundamental to Charter's financial performance, earnings, and valuation.  Given the centrality of broadband to Charter's business, the Company's internet subscriber metrics—particularly net broadband subscriber additions—are the most important performance indicators.

50.     Between 2016 and 2020, Charter invested more than $25 billion to expand and upgrade its broadband infrastructure, including significant investments in rural and underserved areas.  From 2021 through 2023, Charter's reported broadband subscriber base remained relatively flat at approximately thirty million customers.  Specifically, Charter reported approximately 30.1 million internet customers at year-end 2021, 30.4 million at year-end 2022, and 30.6 million at year-end 2023.

## CHARTER BECOMES RELIANT ON THE ACP

51.     In response to the COVID-19 pandemic, Congress included funding in the Consolidated Appropriations Act of 2021 to establish the Emergency Broadband Benefit ("EBB") program.  The FCC adopted the EBB program in February 2021, offering eligible households monthly subsidies of up to $50 for broadband service, or up to $75 for households on qualifying tribal lands, along with a one-time discount for internet-enabled devices.

52.     In November 2021, Congress enacted the Infrastructure Investment and Jobs Act, which allocated approximately $14.2 billion to create a longer-term broadband affordability initiative known as the Affordable Connectivity Program, or ACP.  The ACP officially replaced the EBB and commenced operations on December 31, 2021.  The program was administered by the FCC and designed to expand broadband adoption among low-income households nationwide.

53.     Under the ACP, eligible households received up to a $30 monthly discount on broadband internet service, or up to $75 for qualifying tribal households, as well as a one-time discount toward the purchase of a connected device.  Eligibility was determined based on household income or participation in certain federal assistance programs.  Participating service providers, including Charter, were reimbursed directly by the federal government for each enrolled ACP household.  Providers were prohibited from denying ACP enrollment based on credit checks. ACP subsidies were typically applied to Charter's lowest-priced broadband offerings, including

Internet Assist and other entry-level plans priced at approximately $24.99 to $29.99 per month, allowing many ACP households to receive broadband service at little or no cost.

54.     Charter was a day-one participant in the ACP and quickly became the largest provider in the program. Charter aggressively expanded its participation as part of a deliberate strategy to grow its broadband footprint, particularly among low-income and rural households. The ACP rapidly became one of Charter's most significant growth and retention channels. From the inception of the program through February 2023, Charter received approximately $910 million in federal ACP reimbursements. By 2023, Charter was the single largest ACP participant in the United States, with approximately five million broadband customers receiving ACP benefits through Charter, representing a material portion of the Company's entire broadband subscriber base. Charter repeatedly emphasized its ACP participation to investors, publicly describing itself as the nation's largest ACP provider.

55.     By late 2023 and into the first half of 2024, Charter disclosed that approximately five million of its broadband customers were receiving ACP benefits. This represented approximately 15% to 17% of Charter's total broadband subscribers as of June 30, 2024, a materially higher concentration than that of Charter's primary competitors, including Comcast Corporation ("Comcast"), AT&T Inc. ("AT&T"), and Cox Communications ("Cox"). Comcast, AT&T, and Cox reported that 7-8%, 7-8%, and 7%, respectively, of their customers participated in ACP. As a result, Charter's broadband subscriber trends, churn, average revenue per user, and bad-debt exposure were uniquely sensitive to the continuation or termination of the ACP.

## AS THE ACP WAS SET TO END, ANALYSTS FEARED THE POTENTIAL IMPACTS ON CHARTER

56.     By late 2023, uncertainty surrounding the future of the ACP became increasingly apparent. Despite repeated efforts by industry participants and advocacy groups to secure

additional funding, Congress failed to appropriate new funds to extend the program. As a result, the FCC publicly warned that the ACP would soon exhaust its remaining funding and would be forced to wind down. On January 11, 2024, the FCC announced that new ACP enrollments would end on February 7, 2024, and that the program would terminate entirely once existing funds were depleted. The FCC further advised participating providers that ACP subsidies would be fully funded only through April 2024, would be partially funded in May 2024, and would end entirely as of June 1, 2024. Providers were required to notify ACP customers of these developments and to disclose the resulting increase in their monthly broadband bills once subsidies ended.

57.     At the time of these announcements, more than twenty-three million households nationwide were enrolled in the ACP, including approximately five million Charter customers. Market participants immediately recognized that Charter faced outsized exposure due to its disproportionate reliance on ACP-supported households. Securities analysts publicly questioned whether Charter's low-income customer base would be able to absorb the full cost of broadband service absent the subsidy. For example, at the May 24, 2023 J.P. Morgan Global Technology Conference, defendant Fischer stated: "We've been a big proponent of the program. We've done a lot of work to try to sign up a lot of our subscribers for that program. And it's because it's really valuable to consumers. So if you think about the more price-sensitive segment of the market, that pretty sensitive segment often sort of, let's say, came in and out of our subscriber numbers over time because they're customers that had more issues with churn, whether that was non pay churn or voluntary churn related to a lack of ability to pay.... And what we see with ACP is that customers are able to be constantly subscribed to our product, which it's good for us in terms of a consistent subscription revenue[,]" noting further that "[w]e hope that it continues[.]" At the December 5, 2023 UBS Global Media & Communications Conference, defendant Fischer reiterated that "we're

huge advocates of ACP.  We hope that it continues to get additional funding. And it's really because of what it does for consumers in terms of providing them with continuous connectivity.  So if you think about customers who take advantage of the ACP program, their profile prior to the program would have been a higher nonpay profile."

**INDIVIDUAL DEFENDANTS MISLEAD INVESTORS CONCERNING CHARTER'S MANAGEMENT OF ACP ENDING**

58.     The Individual Defendants issued materially false and misleading statements regarding the true impact of ACP's ending on Charter's operations.  On July 26, 2024, Charter filed a press release with the SEC on a Form 8-K, announcing the Company's financial results for the second quarter (the "Q2 2024 Earnings Release").  That same day, the Company held its second quarter 2024 earnings call (the "Q2 2024 Earnings Call").  During the call, defendant Winfrey emphasized that the loss of residential internet customers due to the end of the ACP was being managed.  Defendant Fischer provided prepared remarks reinforcing that the loss of internet customers was not impacting the Company's ability to execute its growth strategy: "So far, we are *performing well* with ACP retention, *but the largest driver of Internet customer losses associated with the end of the ACP program will be in nonpay disconnects.  And they will occur in the third and fourth quarters, slightly weighted to the third.*"

59.     During the question-and-answer portion of the Q2 2024 Earnings Call, defendant Winfrey reiterated that the effects of the ACP ending were limited.  In response to a question from Craig Eder Moffett of MoffettNathanson LLC, about the ACP impact on gross additions, defendant Winfrey stated: "*It's temporary. It's onetime in nature. And so as we've spoken about before, it's really about just managing through that onetime impact and trying to make sure that we're doing all the right things for preserving that base and keeping them connected, which we're doing*[.]"

60.     In response to an analyst question during the Q2 2024 Earnings Call on broadband market growth trends, defendant Winfrey emphasized that the Company was successfully preserving ACP customers.  In particular, he stated: "*[T]he most dramatic effect is once you flush out the ACP impact between Q2 and Q3 predominantly, then you'll be able to get back into a much more normalized environment….  [W]e're doing everything we can in the meantime to preserve all the ACP customers, doing really well.*"

61.     Also, during the call, Benjamin Daniel Swinburne, of Morgan Stanley asked about Charter's cost actions, defendant Winfrey responded: "So, when you step back, I know you know this, but *ultimately, this ACP transition is a onetime event.*  And so we're very focused on really isolating the ACP impact internally and evaluating not only obviously our performance on retaining those customers, because we want to keep them connected.  We think it's very valuable, and we can."

62.     The above statements were materially false and misleading because they failed to disclose: (i) that Charter had leaned into the ACP far more aggressively and used ACP as a sales tool to inflate broadband subscriber metrics in the short-term and (ii) that ACP-related subscriber losses were not temporary or "one-time" in nature, but that they would repeat, driven primarily by post-ACP churn and continuing non-pay disconnects, as Charter lacked any viable long-term strategy for retaining the ACP cohort once their short-term retention promotions, credits and downgraded plans expired.

63.     Also on July 26, 2024, the Company filed with the SEC its Quarterly Report for the quarterly period ending June 30, 2024 (the "Q2 2024 10-Q").  The Q2 2024 10-Q stated that:

> During the second quarter of 2024, we lost 149,000 Internet customers while adding 557,000 mobile lines. Our Internet customer growth was challenged by the end of the Federal Communication Commission's Affordable Connectivity Program ("ACP"), lower customer move rates and the competitive environment. While our

retention programs for the customers impacted by the end of ACP subsidies have been successful in retaining the vast majority of ACP customers, *the end of the ACP subsidy program was disruptive to our business and resulted in customer losses during the quarter. We expect to see additional one-time impacts on customer net gains, revenue per customer and bad debt in the third and fourth quarters of this year.*

*   *   *

We participated in the ACP and continue to participate in the RDOF subsidy program. The ACP program previously provided up to a $30 monthly subsidy enabling eligible low-income households to purchase our Internet products at a discount or, for a portion of those households, at no cost. The FCC prohibited service providers from enrolling new participants into the ACP after February 7, 2024 and April 2024 was the last month ACP households received the full ACP subsidy. ACP households received a $14 federally funded ACP subsidy in May 2024. As of June 1, 2024, ACP households no longer received the ACP benefit. *The end of the ACP benefit has been, and will continue to be, disruptive to our business. We have lost and will continue to lose customers and revenues and could face greater difficulty in providing services to low-income households in the future.*

64.     At the same time Q2 2024 10-Q emphasized the transitory nature of the ACP's expiration, they did not disclose that Charter's retention of former ACP customers depended heavily on short-term promotions and credits, creating a significant risk that the ACP customers would discontinue service once those offers (typically twelve months or shorter) expired.

65.     As a result of the misrepresentations and omissions on July 26, 2024, Charter's stock price was artificially inflated.  Indeed, the price of Charter's shares went up by $52.39 per share, approximately 16.62% percent, to close on July 26, 2024 at $367.62 per share.

66.     Analysts reacted favorably to the statements and Charter's Q2 2024 financial results.  In its July 26, 2024 report titled "No ACP, No Problem," Deutsche Bank noted:

**The impact from ACP (Affordable Connectivity Program) in 2Q was more muted than we had forecasted and, while there's more impact to be absorbed in 3Q and 4Q, ACP is proving to be less of a headwind across the industry than**

**the market anticipated.**[1] Management estimated that more than 100K of Charter's 149K broadband subscriber net decline was a result of ACP ending, with approximately half of the losses due to voluntary churn and the other half due to reduced gross add activity. **Furthermore, management noted that they will not have a full picture of ACP's impact until the middle of 4Q**, as the Company expects non-pay disconnects to be the largest driver of ACP-related broadband subscriber losses, although these disconnects will be more skewed toward 3Q than 4Q. 2Q had little to no incremental disconnects related to ACP because outstanding bills haven't yet had sufficient time to become past due.

67.    On July 29, 2024, Evercore ISI published a report that noted that "[h]eadwinds from the ACP sunset in 2Q were not as bad as we and the Street had anticipated," and while there was some "uncertainty" given that non-pay would "tick up" in the third quarter, "the net impacts from this 1x event are shaping up to be manageable."  The Evercore ISI analysts further highlighted that "[b]roadband net adds [were] meaningfully better than feared."

68.    On September 4, 2024, defendant Fischer participated in the Bank of America Securities Media, Communications & Entertainment Conference.  During the conference, an analyst asked about the ACP and customers' ability to pay.  Defendant Fischer reassured investors that Charter had weathered the ACP's termination "extraordinarily well" and that those issues had "largely made its way through the system":

> So we continue to do everything that we can to keep customers connected to reliable broadband. ***I think in terms of what we saw in voluntary churn coming out of ACP, that actually has gone quite well….*** And so if I break those 2, voluntary, we expected to take a lot of calls related to the end of ACP credits, which really happened for us in May and June with them stepping down and then fully going away. ***That call volume now has largely made its way through the system. So I think we've seen what we're going to see in voluntary****....*

*    *    *

---

[1] (Emphasis in original.)

And then I know that this is the second question on your list because it's what people are excited about, but I would be remiss not to remind folks, *it's a onetime issue, right, in terms of the impact of ACP going away.*

*I think that ultimately will weather sort of the onetime issue quite well.* But we have always done a great job of serving customers who were more challenged to pay across the market. *We have products in place to sell to them. We have a sales infrastructure that's successful at selling to them. And I think we'll continue to serve that customer group quite well even in a post ACP market.*

69.   Defendant Fischer also underscored that "in the post ACP environment[,]" those non-pay customers would remain Charter customers long-term, as "[t]hey'll fall out of the system, *but then they come back [] in another form.  So, it doesn't change sort of your overall customer level that much*[.]"   The above statements were materially false and misleading because they continued to characterize ACP-related impact as largely completed and temporary.  Confidential witnesses in the Securities Class Action allege that, by September 2024, Charter had already observed accelerating non-pay disconnects, equipment returns, elevated call volumes, and widespread customer distress.  The statements also falsely represented that ACP losses would not materially affect long-term subscriber levels or competitive dynamics.  Charter knew that ACP had artificially inflated subscriber counts, and that there was no long-term plan for what would happen when 12-month credits, promotions, and downgraded plans rolled off.

70.   Analysts reacted positively to the false statements.  On September 10, 2024, analysts at Citi published a report titled "Upgrading Rating on CHTR Share to Neutral[,]" stating: "[T]he core broadband operating environment for 3Q seems stable with prior commentary, and ACP retention seems to be going better than expected for the category."  The Citi analysts stated that "Charter is targeting significant improvement in [earnings before interest, taxes, depreciation, and amortization ("EBITDA")] during 2H24 with its previously announced efforts to reduce expenses that can also support flattish EBITDA for 2025[,]" and emphasized that Charter remains

confident it will be able to drive margins, explaining that despite "multi-year headwinds ... cable firms can manage financial performance with a greater focus on ARPU and operating margins."

71.     On November 1, 2024, Charter filed a press release with the SEC on Form 8-K, announcing the Company's financial results for the third quarter of 2024 (the "Q3 2024 Earnings Release").  That same day, the Company held its third quarter 2024 earnings call (the "Q3 2024 Earnings Call").  During the Q3 2024 Earnings Call, defendant Winfrey repeatedly touted that the end of the ACP was being well managed, and that the end of the ACP would be temporary, "onetime impacts[,]" stating: "*We're also successfully managing the transition of customers previously on the government's Affordable Connectivity Program* in a period of new competition…. *As we work through the onetime impacts of ACP this year, … we remain confident in our ability to drive healthy long-term connectivity customer growth.*"

72.     During the same call, defendant Fischer reiterated that the loss of ACP customers was under control, stating: "*We continued to do a very good job in managing the end of the program*, and we've retained the vast majority of our customers who were previously receiving an ACP benefit."  Defendant Fischer also represented that Charter experienced, "about 100,000 incremental nonpay disconnects and some lagging voluntary disconnects, both related to the end of ACP. *After those effects in the fourth quarter, we expect the onetime impacts from ACP to be behind us.*"

73.     During the question-and-answer portion of the Q3 2024 Earnings Call, analysts questioned defendant Winfrey on the broadband internet trends Charter was seeing.  In response, defendant Winfrey reiterated that Charter was managing the end of the ACP well.  In particular, he stated: "*And then we had obviously the downside of significant ACP primarily through nonpay disconnects and voluntary churn, but we're managing that well.*"

74.    The above statements were materially false and misleading because they continued to portray the ACP transition as temporary and well managed, despite sustained residential internet losses following the program's termination.  By Q3 2024, Charter had already lost hundreds of thousands of internet subscribers year-over-year, yet the Individual Defendants continued to represent that ACP-related impacts were temporary and that the Company was "successfully managing" the transition.  Confidential witnesses in the Securities Class Action allege that non-pay disconnects, equipment returns, retention call backlogs, and churn among former ACP households remained elevated and were expected to persist well beyond Q4 2024, as temporary credits and promotions expired.

75.    On November 1, 2024, the Company filed with the SEC its Quarterly Report for Q3 2024 (the "Q3 2024 10-Q").  The Q3 2024 10-Q continued to report the loss of customers as "one-time impacts":

> During the third quarter of 2024, we lost 110,000 Internet customers while adding 545,000 mobile lines. Our Internet customer growth was challenged by the end of the Federal Communications Commission's Affordable Connectivity Program ("ACP"), lower customer move rates and the competitive environment. While our retention programs for the customers impacted by the end of ACP subsidies have been successful in retaining the vast majority of ACP customers, *the end of the ACP subsidy program has been disruptive to our business and resulted in customer losses during the quarter. We expect to see additional one-time impacts on customer net gains, revenue per customer and bad debt in the fourth quarter of this year.*
>
> *       *       *
>
> We participated in the ACP and continue to participate in the RDOF subsidy program. The ACP program previously provided up to a $30 monthly subsidy enabling eligible low-income households to purchase our Internet products at a discount or, for a portion of those households, at no cost. The FCC prohibited service providers from enrolling new participants into the ACP after February 7, 2024 and April 2024 was the last month ACP households received the full ACP subsidy. ACP households received a $14 federally funded ACP subsidy in May 2024. As of June 1, 2024, ACP households no longer received the ACP benefit. *The end of the ACP benefit has been, and will continue to be, disruptive to our business. We have lost and will continue to lose customers and revenues and*

***could face greater difficulty in providing services to low-income households in the future***.

76.     In a prior section of the same Q3 2024 10-Q, the Individual Defendants affirmatively represented that Charter expected only "one-time impacts" to customer net gains, revenue per customer, and bad debt limited to Q4 2024 due to the end of ACP, thereby conveying that any lingering ACP effects were short-lived and already in the process of being resolved.  At the same time the Individual Defendants emphasized the transitory nature of the ACP's expiration, the Individual Defendants did not disclose that Charter's retention of former ACP customers depended heavily on short-term promotions and credits.

77.     Analysts relied heavily on the representations in reporting positively about the Company.  On November 1, 2024, Morningstar issued a report titled "Charter Earnings: Investors Can Breathe a Sigh of Relief; Shares Attractive" which stated: "With the worst-case scenario likely off the table regarding ACP, we have increased our near-term growth estimates, lifting our fair value estimate to $500 from $490."  On November 3, 2024, RBC increased its price target to $390 from $345 and pointed out that, "[i]mportantly, management guided to 100K ACP internet losses in 4Q24 as the last one-time impact from the ACP funding unwind…. Management guided to nearly 100K ACP related losses in Q4 that are expected to conclude ACP pressures.... We view the ACP developments positively[.]"  On November 4, 2024, Bernstein analysts also reported on the ACP impact going away after Q4, stating: "ACP is expected to have another 100K net loss in Q4 with some lagging voluntary churn, but the impact will dissipate after Q4."

78.     On November 14, 2024, during an interview with CNBC at the Liberty Media Investor Day, defendant Winfrey represented that Charter's broadband business would return to sustainable growth following the fourth quarter, when ACP-related effects would be fully behind the Company.  In particular, defendant Winfrey stated: "***Our view is that with ACP fully behind***

*us, which it will be after the fourth quarter, we expect to return to a healthy rate of growth for broadband*."

79.    On January 31, 2025, Charter filed a press release with the SEC on Form 8-K, announcing the Company's financial results for the fourth quarter and full year of 2024 (the "Q4 2024 Earnings Release").  That same day, Charter hosted its fourth quarter 2024 earnings call (the "Q4 2024 Earnings Call").  During the call, defendant Winfrey claimed that internet customer decline from the end of the ACP had tapered off and that Charter had retained approximately 90% of its ACP customers, presumably through other promotions, stating: "In 2024, *we managed the end of the Affordable Connectivity Program successfully….* As we look to 2025 and beyond, the environment for broadband, mobile and video remains competitive, but we had better visibility than this time last year.  *The impact of the elimination of the ACP is now behind us*."

80.    During the same call, defendant Fischer boasted that Charter's results would no longer be hindered by the termination of the ACP.  In particular, defendant Fischer stated: "*Looking forward, we believe we are past the onetime ACP-related impacts to our customers base*."

81.    During the question-and-answer portion of the call, an analyst from Morgan Stanley questioned defendant Winfrey about how the Company planned to grow internet subscriptions without the ACP.  Defendant Winfrey claimed that there would be no ACP losses this year:

> Look, Ben, from an outlook perspective, we're really confident about the midterm our ability to grow Internet. But we're also sensitive to the fact that there's [] on the cusp in particular periods of time between net loss versus net gain. And so I'm not going to comment on short term small impacts to gross adds or disconnects can have a big impact. *But we won't have the ACP losses this year, and so that's a huge benefit.*

\*         \*         \*

In the meantime, we're pushing through for all these things, ***but not having ACP losses inside this year is huge.*** And I'm not going to give a short-term outlook other than to say we better be -- better this year than we were next year -- or last year.

82.     On January 31, 2025, the Company filed with the SEC its Annual Report for fiscal year 2024 on Form 10-K (the "2024 10-K"), signed by defendants Winfrey, Fischer, Zinterhofer, Conn, Goodman, Maffei, Markley, Merritt, Meyer, Miron, Nair, Newhouse, Ramos, and Slaski. The 2024 10-K reported that:

> During the year ended December 31, 2024, we lost 508,000 Internet customers while adding 2,117,000 mobile lines. Our Internet customer growth was challenged by the end of the FCC's ACP, lower customer move rates and the competitive environment. ***While our retention programs for the customers impacted by the end of ACP subsidies have been successful in retaining the vast majority of ACP customers***, ***the end of the ACP subsidy program has been disruptive to our business and resulted in customer losses during the year.***

83.     The 2024 10-K did not include the prior language from the Q2 2024 and Q3 2024 10-Qs cautioning that the end of ACP "will continue to be disruptive" to Charter's business or that the Company "will continue to lose customers[,]" instead only noting in the past tense that the end of ACP "has been disruptive" and "resulted in customer losses" in 2024.  In doing so, the 2024 10-K falsely represented that any impact from the ACP was now over.

84.     Analysts responded favorably to the representations concerning the end of any ACP-related impacts.  For instance, on January 31, 2025, analysts at RBC Capital Markets published a report titled "CHTR – 4Q24 Review and Model Update," highlighting that Charter "Management expects no ACP disconnects in 2025[.]"  On February 3, 2025, Oppenheimer analysts published a report titled "4Q24 Follow Up: New Bundled Plans Helping Sub Trends[,]" concluding that "ACP is now behind the [C]ompany[.]"

85.     On March 3, 2025, defendant Winfrey participated in the Morgan Stanley Technology, Media & Telecom Conference.  During the conference, an analyst asked about Charter's growth trajectory.  In response, defendant Winfrey stated that the Company had already

- 29 -

moved past the effects of the ACP termination: "And so along the way, we've also invested in accelerating the speed capabilities of our network through network evolution, symmetrical and multi-gig speeds *and you put all that together and having ACP now fully behind us[.]*"

86.     Defendant Winfrey was also asked about the factors influencing broadband customer growth.   Defendant Winfrey downplayed any ongoing impact from the ACP's termination and asserted it was "*clearly behind*" the Company:

> There's still a lot going on. But if you think about compared to last year, cell phone Internet seems to have had its peak in terms of net add rate.  Fiber overbuild, it continues, but it's not anything to do. We've been dealing with that for 10, 15 years. ***ACP, clearly behind us. There's a big benefit to that this year.*** And then the rural builds that continue to produce opportunities for us to drive penetration and growth. And so I think the setup in 2025, there's still external variables. I can cover that. But the setup is a lot better in '25 than it was in '24.

87.     The above statements were materially false and misleading because they represented that ACP impacts were "fully" and "clearly behind" Charter, when the Individual Defendants knew that ACP-related churn, revenue pressure, and customer attrition were continuing to materially affect the business and were expected to persist.  Confidential witnesses in the Securities Class Action allege that a substantial portion of the ACP cohort was only being retained through short-term, bridge promotions that created a substantial risk of delayed ACP-churn well into 2025 once they expired.  These promotions were known internally to be temporary (twelve months), financially unfeasible for low-income ACP households once they expired, and unsupported by any long-term retention strategy.

88.     Additionally, just days before defendant Winfrey told investors that ACP was "clearly behind" the Company, senior management, including defendant Winfrey, internally acknowledged at a quarterly town hall meeting, held on or about February 26, 2025 in Kingsport, Tennessee, that ACP-related subscriber losses remained significant and ongoing.  According to a

confidential witness in the Securities Class Action that attended the town hall, defendant Winfrey discussed ACP, acknowledged that Charter had leaned into ACP far more than competitors and was therefore being hit harder by its termination, and admitted that the Company was still discussing the adverse impact associated with ACP customers continuing to churn.

89.    On March 10, 2025, defendant Fischer participated in the Deutsche Bank Media, Internet & Telecom Conference.   During the conference, an analyst asked about the ACP's "disruptive impact on net adds last year" and whether the Company was "seeing any additional ACP impacts this quarter[.]"  In response, defendant Fischer stated: "So the onetime impact from the end of the ACP program is over."  Although defendant Fischer noted that there was "slightly higher nonpay rates across the business[,]" those subscribers would "come back in the form of growth additions."

90.    While defendant Fischer acknowledged that Charter was experiencing "higher nonpay rates[,]" she downplayed the severity and persistence of that problem by characterizing those effects as merely "slightly" higher and suggesting they were temporary and reversible. Confidential witnesses in the Securities Class Action state that non-pay disconnects were not marginal or isolated but were a primary and worsening driver of ACP-related churn that management internally tracked very closely.

91.    Analysts were reassured that Charter would no longer experience ACP-related impacts to its business.  For instance, on March 13, 2025, Citi published a report titled "Resuming Coverage of Charter Communications with a Buy Rating," stating: "After digesting fewer ACP headwinds than we previously anticipated, ... the [C]ompany has also responded ... with marketing investments, cost reductions, and product investments that should support stable to modestly-growing revenue, better annual EBITDA growth, and rapid FCF acceleration."  Citi highlighted

that "broadband expectations for Charter are in a reasonable place for 2025" and emphasized that "Charter is demonstrating an ability to improve financial performance on an annual basis, even while continuing to lose core broadband subscribers."

92.    On April 25, 2025, Charter filed a press release with the SEC on Form 8-K, announcing the Company's financial results for the first quarter of 2025 (the "Q1 2025 Earnings Release").  That same day, the Company held an earnings call for the first quarter of 2025 (the "Q1 2025 Earnings Call").  In his prepared remarks, defendant Winfrey assured investors that the ACP-impacts were behind the Company: "Our Internet customer results improved year-over-year as we continue to compete well and with the affordable connectivity program headwind now behind us…. The operating environment remains competitive, but the impact of the elimination of the ACP is behind us."

93.    During the question-and-answer portion of the call, defendant Winfrey was asked how the Company planned to grow internet subscriptions in such a competitive environment.  In response, defendant Winfrey stated that Charter was benefitting from ACP being "largely behind" the Company:

> Look, I don't think what we're seeing is that different, and I'll come to that. But I just want to be clear, our sales are up and our churn is relatively stable despite the higher nonpay disconnect that Jessica mentioned. So we feel good about our own trends. The factors that are going into broadband industry growth right now, *we got the end of ACP, it's largely behind us.*
>
>                 \*       \*       \*
>
> *We have not* **seen** *anything significant with the consumer so far* and neither in non-pay disconnect rates, they're up slightly only because of the lack of ACP.

94.    The above statements were materially false and misleading because they repeatedly asserted that the ACP headwind was "behind" or "largely behind" Charter.  Confidential witnesses in the Securities Class Action stated that, through 2025, discussions at town halls and recurring

- 32 -

meetings with executives and senior management—including defendant Winfrey—reflected acknowledgement that this was not the case. In truth, Charter had leaned into ACP far more than competitors and was therefore being hit harder, discussions regarding post-ACP retention efforts were ongoing, and senior management admitted that the Company was still discussing the adverse impacts regarding ACP customers churning and leaving Charter.

95.    On April 25, 2025, the Company filed with the SEC its Quarterly Report for the first quarter of 2025 (the "Q1 2025 10-Q"). The purported "risk disclosures" in Charter's Q2 2024 10-Q and Q3 2024 10-Q, that the end of the ACP "will continue to be disruptive" to Charter's business and that the Company "will continue to lose customers," alleged herein to be materially false and misleading, were notably absent from the Company's Q1 2025 10-Q. As a result, Charter's stock price increased by $38.32 per share, approximately 11.43% percent, to close on April 25, 2025, at $373.65 per share.

96.    The market was reassured by the representations. On April 27, 2025, Oppenheimer published a report titled "1Q25: Relatively Solid Quarter, New Prices/Promotions Helped Subscriber Growth[,]" stating that "ACP is now behind the [C]ompany, and new promos are helping[.]" On April 28, 2025, Bernstein published a report titled "Charter 1Q25: Execution leads the way[,]" concluding that, "[o]verall, Charter's net loss has been improving now that the impact from ACP has already played out[.]" That same day, Raymond James published a report titled "1Q25: Better than Feared; Broadband Pressure Continues[,]" stating that "[w]e continue to view Charter and the cable sector as being in the midst of a multi-year share shift in broadband, but we have to give it credit for weathering that storm better than we had feared a year ago. It would appear the fallout from ACP has beaten the odds for broadband subscribers[.]"

**THE TRUTH EMERGES**

97.     The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge on July 25, 2025.  That day, during premarket hours, Charter filed a press release with the SEC on Form 8-K, announcing the Company's financial results for the second quarter of 2025.  The Company reported that total internet customers had decreased by 117,000, far exceeding the 60,000 internet subscriber losses reported in Q1 2025, and the "50,000 disconnects related to the end of the FCC's Affordable Connectivity Program subsidies in the second quarter of 2024."  As a result of the continued impact of the ACP's end, Charter reported weak Q2 2025 results, including flat revenue, an earnings per share ("EPS") miss ($9.18 vs. $9.77 consensus estimates).  When onetime mobile revenue of $45 million was excluded, it represented the first EBITDA decline in the Company's history.

98.     Also, on July 25, 2025, the Company held an earnings call to discuss Charter's second quarter financial results (the "Q2 2025 Earnings Call").  During the call, an analyst asked about whether "nonpaid churn" from ACP increased during the quarter and was "one of the drivers" of the "core declines."  In response, defendant Winfrey admitted that "***nonpay has stepped up year-over-year***" and that, in contrast to his prior assurances that the ACP impact was "behind us[,]" the end of the ACP continued to have a material impact on financial results.  In particular, defendant Winfrey admitted that Charter's business was deteriorating precisely because of the lack of ACP subsidies, as: (i) former ACP customers had a "higher nonpay rate systemically without the benefit of the [ACP] subsidy[,]" and (ii) "newly acquired customers, who would have qualified for the ACP, who don't have ACP today ... have a higher nonpay rate than they would otherwise."

99.     The Company was heavily reliant on ACP customers and the Individual Defendants failed to inform the public that the ACP impact was far from over.  Below is a chart detailing how once ACP ended, the effects were not "temporary," but continued to worsen over time:



100.    On this news, Charter's stock price plummeted $118.25 per share, or 31.12%, for over a week until August 4, 2025, to close at $261.75 per share, a $16.1 billion loss in market capitalization that was the Company's largest single day decline.

101.    Analysts were shocked by the disclosure.  On July 25, 2025, Barclays published a report emphasizing that Charter's poor results represented a sharp turn from Individual Defendants' prior statements to investors, stating: "Charter management had outlined expectations for broadband sub growth, which is the primary KPI focus for investors" and "helped support a narrative of better execution at Charter."  Instead, Barclays noted that the "higher non-pay churn" represented "the reverse of this positioning[,]" and "given that ~20% of the base at the peak was part of the ACP program, this churn is likely to remain elevated to some extent[,]" and thus "it remains tough to get behind Charter's broadband turnaround narrative[.]"

- 35 -

102. On July 25, 2025, MarketWatch published an article that underscored the significance of Charter's ACP subscriber losses, highlighting that "Charter[] is bleeding subscribers — and the stock had its worst day ever[.]"  MarketWatch stated that, "for Charter investors, it's all about the internet" and, "[a]s always, the market's assessment of Charter's results ... will begin, and largely end, with broadband net adds[.]"

103. Analysts also cited Charter's continued losses in broadband as the primary reason for Charter's stock crash.  For instance, on July 28, 2025, The Measure, an online research platform, noted that "the continuing loss of broadband subscribers was the biggest reason why Charter's stock plunged more than 18% on Friday after the numbers were released."

104. On July 28, 2025, Raymond James issued a report which expressed surprise that Charter continued to report an "ACP hangover[,]" given management's prior representations that ACP-related impacts would cease by the beginning of the year.  Raymond James stated that the "ACP hangover bites back" and explained that "[w]e had expected the last part of the ACP hangover to hit Charter in [the first quarter], so we were surprised when it did not[.]"  On August 21, 2025, Wells Fargo reported that "CHTR shares were down >20% in the two days following its Q2 earnings report" because "investors believe[d] the impact from ACP was fully behind CHTR."

**THE DIRECTOR DEFENDANTS CAUSED CHARTER TO REPURCHASE ITS OWN STOCK AT ARTIFICIALLY INFLATED PRICES**

105. Despite their knowledge, or reckless disregard for, the Company's growth prospects, the Board approved substantial stock repurchases at artificially inflated prices.  In 2017, the Board granted authority for $750 million of Class A common stock buybacks under a rolling six-month authority.

106. On November 12, 2024, Charter and Liberty Broadband Corporation ("Liberty Broadband") entered into a Stockholders and Letter Agreement Amendment which set forth,

among other things, the terms of Liberty Broadband's participation in Charter share repurchases during the period between the execution of the Charter/Liberty Broadband Agreement and Plan of Merger and the effective time of the merger.  Under the terms of the Stockholders and Letter Agreement Amendment, Charter would repurchase shares of Charter Class A common stock from Liberty Broadband in an amount equal to the greater of (i) $100 million; and (ii) the Liberty Broadband minimum liquidity threshold as set forth in the Stockholders and Letter Agreement Amendment, provided that in the event any repurchase would reduce Liberty Broadband's equity interest in Charter below 25.25%, Charter would instead loan to Liberty Broadband an amount equal to the lesser of (x) the repurchase amount that could not be repurchased, and (y) the Liberty Broadband minimum liquidity threshold as set forth in the Stockholders and Letter Agreement Amendment.  Defendant Fischer signed the Stockholders and Letter Agreement Amendment on behalf of Charter.  Defendant Miron signed the Stockholders and Letter Agreement Amendment on behalf of Advance/Newhouse Partnership ("A/N").

107.    In December 2016, Charter and A/N entered into a letter agreement that requires A/N to sell to Charter or Charter Communication Holdings, LLC ("Charter Holdings"), on a monthly basis, a number of shares of Charter Class A common stock or Charter Holdings common units that represents a pro rata participation by A/N and its affiliates in any repurchases of shares of Charter Class A common stock from persons other than A/N effected by Charter during the immediately preceding calendar month, at a purchase price equal to the average price equal to the average price paid by Charter for the shares repurchased from persons other than A/N during such immediately preceding calendar month.  The parties entered into an amendment to the letter agreement on May 16, 2025, and under the amended letter agreement A/N could elect not to

participate in redemptions by Charter Holdings if such participation would cause A/N's equity interest in Charter to be less than 11% and instead elect to receive a tax loan from Charter Holdings.

108.   While the price of Charter's stock was inflated due to the false and misleading statements by the Individual Defendants, the Director Defendants caused Charter to repurchase 7,480,516 shares of its own common stock in the open market for a total of $2,792,811,926 before the truth fully emerged.  Given that the price of Charter stock was $261.75 per share after the disclosures on July 25, 2025, the true value of the repurchased shares was roughly $1,958,025,063. Accordingly, the Company overpaid $834,786,862 to repurchase these shares.

109.   The Company also repurchased 843,169 shares from A/N for $300 million.  Given that the price of Charter stock was $261.75 per share after the disclosures on July 25, 2025, the true value of the repurchased shares was roughly $220,699,579.  Accordingly, the Company overpaid $79,300,420 to repurchase these shares from A/N.

110.   The Company also repurchased 283,227 shares from Liberty Broadband for $109 million.  Given that the price of Charter stock was $261.75 per share after the disclosures on July 25, 2025, the true value of the repurchased shares was roughly $74,134,727.  Accordingly, the Company overpaid $34,865,272 to repurchase these shares from Liberty Broadband.

## DAMAGES TO CHARTER

111.   As a result of the Individual Defendants' improprieties, Charter disseminated improper, public statements concerning how adverse effects from ACP ending continued to negatively impact the Company's operations.  These improper statements have devastated Charter's credibility as reflected by the Company's almost $16.2 billion, or 31.12%, market capitalization loss.

112.     Charter's performance issues also damaged its reputation within the business community and in the capital markets.  Charter's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

113.     Further, as a direct and proximate result of the Individual Defendants' actions, Charter has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

(b)     costs incurred from overpaying approximately $948.9 million to repurchase shares;

(c)     costs incurred from failing to mitigate the risk of becoming dependent on the ACP;

(d)     costs incurred from failing to prevent churn which only worsened the impact of the ACP funding expiring; and

(e)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Charter.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

114.     Plaintiff brings this action derivatively in the right and for the benefit of Charter to redress injuries suffered, and to be suffered, by Charter as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof,

by the Individual Defendants.  Charter is named as a nominal defendant solely in a derivative capacity.

115.    Plaintiff will adequately and fairly represent the interests of Charter in enforcing and prosecuting its rights.

116.    Plaintiff was a stockholder of Charter at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Charter stockholder.

117.    The current Board of Charter consists of the following thirteen individuals: defendants Winfrey, Zinterhofer, Conn, Markley, Nair, Miron, Newhouse, Ramos, Goodman, and Slaski, and non-parties Patterson, Wargo, and Davis.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

118.    Defendants Winfrey, Zinterhofer, Conn, Goodman, Markley, Miron, Nair, Newhouse, Ramos, and Slaski's breaches of their fiduciary duties exposed Charter to increased risk.  Moreover, defendants Winfrey, Zinterhofer, Conn, Goodman, Markley, Miron, Nair, Newhouse, Ramos, and Slaski signed the 2024 10-K.  Additionally, defendants Winfrey, Zinterhofer, Conn, Goodman, Markley, Miron, Nair, Newhouse, Ramos, and Slaski face a substantial likelihood of liability for causing the Company to repurchase its shares at an artificially inflated price.  Charter paid $2.7 billion to repurchase 7.4 million shares between August 2024 and July 2025 on the open market.  As a result, the Company overpaid approximately $834 million for repurchased shares.  Charter also overpaid A/N and Liberty Broadband approximately $79.3 million and $34.8 million, respectively, for repurchased shares.  Further, defendant Miron signed the Stockholders and Letter Agreement Amendment on behalf of A/N.  Thus, defendants Winfrey, Zinterhofer, Conn, Goodman, Markley, Miron, Nair, Newhouse, Ramos, and Slaski each faces a

- 40 -

substantial likelihood of liability for their acts in connection with these actions and statements, rendering demand upon them futile.

119.    Defendants Winfrey, Zinterhofer, Conn, Goodman, Markley, Miron, Nair, Newhouse, Ramos, and Slaski served as directors of the Company during the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein, including violations of the Exchange Act.  The actions these defendants repeatedly and continuously caused or allowed to occur, particularly with respect to the materially false and misleading statements concerning ACP's lasting adverse impacts.  It was these very actions, caused or allowed by defendants Winfrey, Zinterhofer, Conn, Goodman, Markley, Miron, Nair, Newhouse, Ramos, and Slaski that caused the Company to suffer severe harm (financial and reputational), as set forth herein.  This was in violation of (among other things) these defendants' fiduciary duties, as well as the Company's Corporate Governance Guidelines and Code of Conduct.

120.    Defendants Markley, Goodman, and Slaski, as members of the Audit Committee, reviewed and approved the improper statements.  Pursuant to the Audit Committee Charter, the members were, and are, responsible for reviewing the integrity of the Company's internal controls, reviewing legal and regulatory matters that may have a material impact on the financial statements, and discussing with management the corporation's programs to monitor compliance with laws, regulations, and internal policies and standards.  Defendants Markley, Goodman, and Slaski breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee allowed or permitted the Company to make materially false and misleading statements.  Therefore, defendants Markley, Goodman, and Slaski face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

121.    The principal professional occupation of defendant Winfrey is his employment with Charter, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.  According to the Company's proxy statement filed March 12, 2026, he is not an independent director.  As a result, defendant Winfrey lacks independence from defendants Zinterhofer, Conn, Goodman, Markley, Miron, Nair, Newhouse, Ramos, and Slaski due to his interest in maintaining his executive position at Charter. Accordingly, defendant Winfrey is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Winfrey.

122.    Liberty Broadband also holds a substantial amount of Charter stock along with the A/N.  According to the proxy statement filed March 12, 2026, Liberty Broadband and A/N hold 29.07% and 13.21% of the Company's Class A common stock, respectively.  Pursuant to a stockholders agreement, Liberty Broadband has designated three directors to the Board—Nair, Patterson, and Wargo.  A/N has designated two directors to the Board—Miron and Newhouse. Miron and Newhouse would be hard pressed to independently investigate the A/N repurchases because Newhouse is co-president of the parent of A/N and its affiliates and Miron is the CEO of A/N.  Patterson and Wargo would struggle to independently investigate the Liberty Broadband share repurchases given that Patterson is the President and CEO of Liberty Broadband and Wargo is a director of Liberty Broadband.

123.    In addition to the influence Liberty Broadband has on the Board, many of the directors have conflicting relationships.  Liberty Global Ltd. ("Liberty Global") was formed through a series of mergers that were completed on June 7, 2013.  Liberty Global plc became the

publicly-held parent company of the successors by merger of Liberty Global, Inc. (the predecessor to Liberty Global plc) and Virgin Media Inc.  Ramos and Wargo were employed at Liberty Global with an overlapping period of June 2005 to February 2015, which also overlapped with defendant Nair from July 2007 to February 2015.

124.   Liberty Latin America Ltd. ("Liberty Latin America") was formed on December 29, 2017, from a split-off of Liberty Global's LiLAC Group.  In connection with the split-off transaction, Liberty Latin America became a separate publicly-traded company.  Liberty Latin America is a communications company with operations in Puerto Rico, Panama, Costa Rica, the Caribbean, including Jamaica, and other parts of Latin America.  Millicom International Cellular S.A. ("Millicom") is a provider of fixed and mobile services dedicated to emerging markets. Defendants Nair and Zinterhofer were employed at Liberty Latin America with an overlapping period starting in December 2017 through the present.  During the overlapping period, defendant Nair was CEO and President of Liberty Latin America and defendant Ramos was Chairman of the Millicom Board.  On August 1, 2024, Millicom signed a binding agreement with Liberty Latin America to combine their operations in Costa Rica in a cashless merger in which Millicom would retain a minority equity ownership of approximately 14%.  Defendants Nair and Ramos were directly involved in the agreement between Liberty Latin America and Millicom.

125.   Liberty Media Corporation ("Liberty Media") is a media, communications and entertainment company.  Patterson and defendant Maffei were employed at Liberty Media with an overlapping period of June 2010 to December 2024.  During the overlapping period, defendant Maffei was the CEO and President while Patterson was the Senior Vice President.

126.   Liberty TripAdvisor Holdings, Inc. ("TripCo") was formed in 2013 as a Delaware corporation.  TripCo was a subsidiary of Liberty Interactive Corporation (subsequently renamed

Qurate Retail, Inc. ("Qurate Retail")) until the completion of its spin-off from Qurate Retail on August 27, 2014.  Following the TripCo spin-off, Qurate Retail and TripCo operate as separate, publicly traded companies, and neither has any stock ownership, beneficial or otherwise, in the other.  TripCo does not have any operations outside of its controlling interest in its subsidiary, Tripadvisor, Inc. ("Tripadvisor").  Defendant Maffei and Wargo are employed at TripCo with an overlapping period starting in August 2014 through present, which also overlapped with Patterson until at least April 2025.  During the overlapping period, defendant Maffei was the CEO as well as Chairman of the board of TripCo.

127.   Atlanta Braves Holdings, Inc. ("Atlanta Braves Holdings") was formed on July 18, 2023, because of a split-off transaction.  During November 2022, the board of directors of Liberty Media authorized Liberty management to pursue a plan to redeem each outstanding share of its Liberty Braves common stock in exchange for one share of the corresponding series of common stock of a newly formed entity, Atlanta Braves Holdings, Inc.  The split-off was completed on July 18, 2023.  Defendant Maffei and Patterson were employed at Atlanta Braves Holdings with an overlapping period until at least August 2024.  During the overlapping period, defendant Maffei was the CEO, President, and Chairman of the board.

128.   All Points Broadband ("All Points") is a fiber-to-the-home provider dedicated to bridging the digital divide and bringing high-speed internet access to underserved communities throughout Virginia and beyond.  SearchLight Capital ("SearchLight") is global investment firm, founded in 2010 by defendant Zinterhofer.  On July 6, 2021, SearchLight and Simple Broadband LLC announced their initial strategic investment in All Points.  During the overlapping period, defendant Markley was on the board of and an investor in All Points.

- 44 -

129.   Cable-Satellite Public Affairs Network ("C-SPAN") is a public service created by the American Cable Television Industry.  C-SPAN is a non-profit created in 1979 by a then-new industry called cable television.  Defendants Miron and Winfrey currently serve as directors of C-SPAN.

130.   TelevisaUnivision, Inc. ("TelevisaUnivision") is a Spanish-language media company that produces original content in Spanish across news, sports and entertainment verticals. Davis and defendant Zinterhofer serve on TeleviaUnivision's board with an overlapping period starting in December 2020 through present.  During the overlapping period, Davis was the CEO and Vice Chairman of the board while defendant Zinterhofer was a director.  Defendant Zinterhofer is also the founder of SearchLight which invested in TelevisaUnivision in 2020 "in support of [Davis'] vision of a holistic, growth-led turnaround of the business[.]"  Defendants Ramos, Nair, Zinterhofer, Miron, Winfrey, and Markley along with directors Wargo, Patterson, and Davis are incapable of impartially considering a demand to commence and vigorously prosecute this action.  Accordingly, demand upon defendants Ramos, Nair, Zinterhofer, Miron, Winfrey, and Markley along with directors Wargo, Patterson, and Davis is futile.

## <u>COUNT I</u>

**Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

131.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.   During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about Charter, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or

misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

133. While the price of the Company's common stock was inflated due to the false and misleading statements made by the Individual Defendants, the Director Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices. The Director Defendants engaged in a scheme to defraud Charter by causing the Company to repurchase $3.2 billion in shares of its own stock at artificially inflated prices.

134. The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Charter in connection with the Company's repurchases of its own stock during the period of wrongdoing.

135. The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Charter stock, which were intended to, and did: (a) deceive Charter and its stockholders regarding, among other things, the true impact of ACP ending; (b) artificially inflate and maintain the market price of Charter's stock; and (c) caused

Charter to repurchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the period of wrongdoing, the defendants were in possession of material, nonpublic information regarding the above.

136. The Individual Defendants were among the senior management and directors of the Company, and were therefore directly responsible for, and are liable for, all improper statements made during the period of wrongdoing, as stated above.

137. The Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that the defendants should have been aware of them. Throughout the period of wrongdoing, the defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

138. The Individual Defendants' false or misleading statements and omissions were made in connection with the repurchases of Charter stock by the Company.

139. As a result of the Individual Defendants' misconduct, Charter has and will suffer damages because it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing were disclosed.

140. Charter would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

141. As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with the repurchases of Charter stock during the

period of wrongdoing. By reason of such conduct, the Individual Defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

142. Plaintiff, on behalf of Charter, has no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

143. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144. The Individual Defendants, by virtue of their positions with Charter and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Charter and officers and directors who made the false and misleading statements alleged herein within the meaning of section 20(a) of the Exchange Act. The Individual Defendants had the power and influence—and exercised that power—to cause Charter to engage in the unlawful conduct and practices complained of herein.

145. Plaintiff, on behalf of Charter, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Breach of Fiduciary Duty**

146. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147. The Individual Defendants owed and owe Charter fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Charter the highest obligation of care and loyalty.

148. The Individual Defendants and each of them, violated and breached their fiduciary duties. The Individual Defendants breached their duty of loyalty by recklessly permitting the improper activity concerning Charter's materially false and misleading statements. The Individual Defendants knew or were reckless in not knowing that adverse impacts from ACP would last into 2025. Accordingly, these defendants breached their duty of loyalty to the Company.

149. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants com failed in their duty to appropriately review financial results and disclosures, as required by the Audit Committee Charter in effect at the time.

150. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Charter has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

151. Plaintiff, on behalf of Charter, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

152. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153. As a result of the materially false and misleading statements, the Company by failing to conduct proper supervision, the Individual Defendants have caused Charter to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty. The Director Defendants further wasted the

Company's assets by causing Charter to repurchase over $3.2 billion in shares of its own stock at artificially inflated prices.

154.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

155.    Plaintiff, on behalf of Charter, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants for Unjust Enrichment**

156.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Charter.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Charter.

158.    Plaintiff, as a stockholder and representative of Charter, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

159.    Plaintiff, on behalf of Charter, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Charter, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Charter to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Charter and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over risk management;

2.    a proposal to strengthen Charter's oversight over repurchases;

3.    a proposal to strengthen Charter's oversight of its disclosure procedures;

4.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

5.    a provision to permit the stockholders of Charter to nominate at least three candidates for election to the Board.

C.    Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder;

D.    Awarding to Charter restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  April 3, 2026

JOHNSON FISTEL, PLLP


*/s/ Ralph M. Stone*
RALPH M. STONE

620 Fifth Avenue, 2nd Floor
New York, NY 10020
Telephone: (212) 292-5690
Facsimile: (619) 363-8326
E-mail: ralphs@johnsonfistel.com

JOHNSON FISTEL, PLLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Tel.: (470) 632-6000
Fax: (619) 363-8326
E-mail: MichaelF@johnsonfistel.com

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
csmith@robbinsllp.com
ssanders@robbinsllp.com

Attorneys for Plaintiff

1718445

## **VERIFICATION**

I, Larry Curti, hereby declare as follows:

I am the plaintiff in this action.  I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 4/1/2026 _____

Signed by:

*Larry Curti*

B2FF89B3C788490...

LARRY CURTI